111 So.2d 468 (1959)
Max A. ROY and Patricia M. Roy, Appellants,
v.
Robert Lee HOLMES and Marylu (Aubrey) Holmes, Appellees.
No. 603.
District Court of Appeal of Florida. Second District.
May 1, 1959.
Jordan & Jordan, Tampa, for appellants.
*469 William G. Gardiner, St. Petersburg, for appellees.
PATTERSON, TERRY B., Associate Judge
The appellants, Max A. Roy and Patricia Roy, his wife, who were respondents below, seek reversal of a final decree of adoption of the appellants' son entered in favor of the appellees, Robert Lee Holmes and Marylu Holmes, his wife, who were petitioners in the trial court. The parties will be designated as petitioners and respondents in this opinion.
The first question raised by respondents questions the jurisdiction of the Circuit Court of Pinellas County on the ground that the evidence conclusively establishes that both the petitioners and the adoptive child are residents of Hillsborough County rather than Pinellas. The Chancellor heard the evidence of the parties on the question of the petitioners' residence and found them to be in fact residents of Pinellas County and denied respondents' motion to dismiss on that ground. We have examined the evidence and cannot say that the Chancellor erred in his conclusion.
The principal question, then, on this appeal is whether the evidence in this case supports the findings and conclusions of the Chancellor and the entry of the decree of adoption appealed from.
In 1954 the respondent, Max Roy, was hospitalized with an injury and attending disorders suffered in the service. The respondent, Patricia Roy was also suffering from a spinal disorder which demanded her hospitalization for an indefinite period. Having no way to care for their child during the emergency the parents contacted the petitioners through the child's maternal grandmother and petitioners agreed to care for the child for two weeks while Patricia Roy was hospitalized in Clearwater. By the end of the two weeks petitioners sought and gained permission to keep the child for six months, the period it was anticipated that the mother would be hospitalized. The child was 10 months old when petitioners first obtained it.
The petitioners during this period apparently became attached to the child and shortly after the six months period sought permission to adopt the child. They were advised that the parents had no intention of allowing the adoption of the child but were still not in a position to care for it. As a result the parents agreed that the petitioners could keep the child longer and in return the parents agreed to contribute to its support in such amounts as they were able, there being no fixed amount agreed upon.
Thereafter the parents failed in their promised contributions toward the child's support and the petitioners secured an order out of the Juvenile Court of Pinellas County awarding them temporary custody of the child and ordering the father to pay to the petitioners $10 per week to be applied on an arrearage of $250. The father paid only a total of $62.50 on such support order and the evidence shows that the order was entirely disregarded over the following years while the petitioners retained custody of the child.
The remainder of the unhappy picture is one of conflict between the parties, including the grandparents of the child, for its custody. The evidence strongly suggests that the parents, all the while professing a desire to have the care and custody of their child, have managed to shirk any financial responsibility for its care except inconsequential gifts and insubstantial and irregular contributions, although their income would have justified compliance with the Juvenile Court's support order noted above. The child's paternal grandparents sought the child's custody through the Juvenile Court which application was resisted by the petitioners and denied by the Court.
Over the four years the child has been with the petitioners the child has become adjusted to their home and because of the defaults of the parents there has accumulated *470 a substantial arrearage for the child's support which the parents are not now able to pay.
So far as the evidence in this case shows, the respondents are now as well situated as petitioners to care for their child and to provide it a home. They now have a home in Tampa and have another son, now a year and a half old, who is the full brother of the child involved in this case. Although they have heretofore been preoccupied with their own troubles to the neglect of the child here involved, the evidence does not exclude the possibility that they have now overcome their difficulties, just as have the petitioners, and are now in a position to afford the child its proper care and attention.
The State Welfare Board found that the child was well adjusted and cared for in the petitioners' home and recommended the adoption provided the Court should see fit to terminate the natural right of the respondents, concerning which it made no recommendations.
The Chancellor found that the petitioners are morally fit, proper and stable parties to adopt the child. He did not make the specific finding that the respondents were unfit morally or otherwise to have the care and custody of their child. Instead, his approval of the adoption was based upon the findings that the natural parents had "duly and effectively abandoned" the child; and that it would be prejudicial to the child's welfare to remove it from the home in which it is happy and well adjusted and "place him with the natural parents and into an atmosphere the future of which is unknown and at best purely conjectural and one which, from what can be gleaned of the past in no wise recommends itself to the Court."
It thus appears that this adoption is bottomed squarely on a finding of abandonment by the natural parents coupled with the child's adjustment to its foster home over a period of some four years.
Were these parties in equal status before the law in their contest for this child we could easily agree with the Chancellor's conclusions. But such is not the case. It has been said that many children would be better off in adopted homes, but this is not a ground for adoption. While it is legally possible for strangers to the blood to adopt children over the objection of their parents the law of this State, so clearly expressed in Torres v. Van Eepoel, Fla., 98 So.2d 735, 737, is that such an adoption can be approved only when it is established by clear and convincing evidence that the child's welfare demands it. In that case the Supreme Court through Justice Thornal said:
"It is unnecessary to elaborate upon our oft-repeated conclusion that a natural parent has a right to the custody of his or her children absent conduct or conditions that justify a deprivation of the right in the interest of the welfare of the children. This legal right is one that should not be lightly regarded. True the right is not absolute as against the actual welfare of the child. However, in order to deprive a parent permanently of the custody of his offspring the evidence relied upon should be clear and convincing. In re Whetstone, 137 Fla. 712, 188 So. 576. Conditions which might justify relieving a parent temporarily of the custody of his child would not necessarily support absolute and permanent transfer of the child to a stranger or even other near-kin."
We may go further to say that such a rule is a salutary and needful restraint upon the power of governmental authority to inject itself into the natural arrangement of the family and the natural relation of parent and child. And we think that the interests and welfare of the child are best served by the rule. Certainly adoptions in most cases serve a laudable and beneficial purpose but where there is a choice to be made between a natural and an adopted status the welfare of the child strongly *471 favors the former, absent strong and compelling reasons to the contrary. Parents are by no means required to face strangers to their blood on equal terms in contention for the parental rights to their children. The law is solicitous of the welfare of the child, and indeed where they are irreconcilable the welfare of the child will in proper cases be given primacy over the natural rights of the parent. Nevertheless we think that the rule quoted from the Torres case, supra, means that except in cases of clear, convincing and compelling reasons to the contrary the child's welfare is presumed to be best served by care and custody in the natural family relation by its natural parents, and that transitory failures and derelictions of the parents might justify temporary deprivation of custody by appropriate proceedings but seldom the permanent deprivation of parental rights with the finality of an adoption decree.
We have carefully examined the entire record in this case and are compelled to disagree with the Chancellor's finding that the respondents have duly and effectively abandoned the child and thus forfeited their parental right. Abandonment in contemplation of the law of adoption has been stated generally to consist in conduct which evinces a settled purpose permanently to forego all parental rights and to relinquish all parental claims to the child. Cases on the question of what facts constitute such abandonment are collected in an annotation on the subject in 35 A.L.R.2d beginning at page 662. Our study of the cases there cited and the evidence in this case leads us to the conclusion that the respondents have been guilty of blameworthy neglect, indifference and irresponsibility for their child's welfare but have never permanently abandoned their parental rights to the extent that they have lost the protection of the law against their permanent deprivation by the adoption here sought over their objection. Their indifference to the child's financial support is certainly not to be commended, constitutes a gross imposition on the good offers of the petitioners and might well be the basis of a legal obligation for reimbursement. Nevertheless "judicial impatience with the vagaries of parents" must not allow transitory derelictions to work a permanent forfeiture of the parental right and status. On this proposition see the cases collected under the topic "Failure to Support", 35 A.L.R.2d 680.
We do not overlook the trial judge's concern for the effect of removing this child from the adoptive home to which he has over most of his young life become adjusted as his own. Obviously a period of readjustment will be necessary when that occurs; but we think such a readjustment in this case of a five year old child, while unfortunate, is yet a relatively transitory and surmountable problem and that in the long view his best interest will be served by his readjustment into the home of his natural parents and blood brother when his parents can show to the Juvenile Court that they and their home surroundings are ready to receive him.
The Chancellor's low regard for the reliability and sincerety of the respondents may have basis in the evidence and the appearance of the witnesses before him, and we are reluctant to overrule him. We nevertheless conclude that a proper recognition of their parental rights requires that we disapprove an adoption which would irrevocably terminate respondents' chance to re-establish their lives and their family as they now profess their ability and intention to do.
The decree of adoption is reversed and this cause is remanded with directions to dismiss the adoption proceedings. Such a dismissal will not disturb the jurisdiction of the Juvenile Court of Pinellas County of the subject matter as it existed prior to the institution of the adoption proceedings.
Reversed.
KANNER, C.J., and ALLEN, J., concur.