382 So.2d 339 (1980)
Doris Tilyou SOLOMON, Appellant,
v.
Donald L. McLUCAS et ux., Appellees.
No. 79-769.
District Court of Appeal of Florida, Second District.
March 5, 1980.
Rehearing Denied April 17, 1980.
*341 Manuel W. James, Key West, and Ronald A. Dion, Law Office of Alvin Entin, North Miami Beach, for appellant.
Fletcher Brown, Arcadia, and Daniel A. Carlton of Dickenson, O'Riorden, Gibbons, Quale, Shields & Carlton, Sarasota, for appellees.
DANAHY, Judge.
Appellant, the natural mother of six year old Jennifer Renee, brings this appeal from a final judgment granting appellees' petition to adopt Jennifer. Jennifer's natural father gave his written consent to the adoption, but appellant did not. Appellant's consent was required unless the trial judge excused her consent on one of the grounds specified in Section 63.072, Florida Statutes (1977). The trial judge impliedly did so by expressly finding that appellant had abandoned Jennifer. We hold that the evidence in this case was not sufficient to justify that finding, and we reverse.
Appellant was sixteen years old when Jennifer was born and her marriage to Jennifer's father disintegrated shortly thereafter. The parents separated permanently by mutual agreement in July of 1975, when Jennifer was just 8 months old. Appellees, who are appellant's maternal uncle and his wife, took appellant and Jennifer into their home in Arcadia and it was at this time that appellant first left Jennifer in their care. Jennifer remained in appellees' home for several months, with appellant present intermittently. During this time appellees provided the physical care and attention needed by the baby, with somewhat haphazard contributions by appellant, who obviously had a typical seventeen-year-old's preference for activities with young people her own age.
Appellant did, however, exhibit an awareness of her adult responsibilities. She testified that when she left Jennifer with appellees this first time, she went to Clewiston to get a job and that when she got a job, she came back and got Jennifer. Appellees testified that Jennifer was with them for a period of approximately 4 months, from July to October of 1975, and that appellant also lived with them for approximately five weeks during this time.
In any event, in October of 1975, appellant picked up Jennifer and the two of them traveled to Delaware in the company of John Allen Walterson, a man with whom appellant was then living. Apparently at the behest of other family members who were worried about the situation, appellees went to Delaware in February of 1976 and brought appellant, Walterson, and Jennifer back with them to Arcadia.
It was at this point that appellant last left Jennifer in the custody of appellees, *342 where Jennifer has since remained. Appellant testified that she did so because Walterson was "weird", hostile, and abusive, and because appellant was financially unable to support Jennifer at that time. Appellant said she never intended to give permanent custody to appellees, that this started out as a family arrangement for the welfare of Jennifer, and appellant always considered it to be temporary. Appellant was 18 years old and Jennifer 26 months old at the time.
Appellees filed their petition to adopt Jennifer on October 27, 1977. Both the trial judge and appellees, in discussing whether there was an abandonment in this case, refer to a time span from February of 1976 to the date of the final hearing, which did not take place until February 9, 1979.[1] However, it is undisputed that appellant promptly filed an answer to the petition for adoption and has vigorously contested Jennifer's adoption by appellees. Therefore, failures on appellant's part to support, contact, or see Jennifer after the filing of the petition for adoption are, in our view, immaterial. The pertinent time span in this case is from February 1976, to October 27, 1977, a period of approximately 19 months. Our sole inquiry on this appeal is whether the evidence in this case met the standard of proof necessary to show an abandonment of Jennifer by appellant during this period of time which would permit Jennifer's adoption by appellees without appellant's consent.
Before reviewing the evidence pertinent to that inquiry, we find it necessary to discuss those factors which are not relevant in determining whether a nonconsenting parent's rights should be terminated in an adoption proceeding. Section 63.142 permits the entry of a judgment of adoption when the trial judge determines that all necessary consents have been obtained and that the adoption is in the best interests of the person to be adopted. The final judgment in this case contains several recitations of fact which are relevant only to the second determination, but the trial judge merged his findings and conclusions in such a way that he appears to have considered the best interests of Jennifer in deciding whether appellant's consent to the adoption was necessary. That factor does not enter into such a decision.
The final judgment recites that Jennifer had previously been declared a dependent child in a separate proceeding under Chapter 39 and was placed with appellees pursuant to orders entered in that proceeding on February 24, 1976, and March 1, 1977;[2] that since February of 1976, Jennifer has been solely in the custody of appellees and has developed a parent-child relationship with them which is the only parental relationship Jennifer knows; and that disrupting this developed relationship with appellees would be a serious problem for Jennifer. The final judgment further states that appellees established by clear and convincing evidence that the adoption would be in the manifest best interests of Jennifer; that appellees are sincerely interested in *343 Jennifer's welfare; and that appellees would provide a wholesome home atmosphere and environment. Finally, the final judgment states that the Department of Health and Rehabilitative Services filed a written recommendation that permanent custody of Jennifer be granted to appellees.
These findings and conclusions do not provide a legally sufficient basis for terminating the rights of a natural parent by granting a petition for adoption without that parent's consent. Matter of Adoption of Noble, 349 So.2d 1215 (Fla. 4th DCA 1977). Despite what this court and other Florida courts may have said in the past indicating that an adoption may be granted over the objection of a natural parent if it would serve the best interests of the child, since the passage of Section 63.072, Florida Statutes (1977), effective October 1, 1973, the grounds upon which adoption may be granted in the absence of the written consent of a natural parent whose consent is required are only those specified in that section. The best interests of the child is not one of them. Nelson v. Herndon, 371 So.2d 140 (Fla. 1st DCA 1979).
We are aware of the concerns expressed by Judge Mills in his specially concurring opinion in Nelson v. Herndon, supra, and recognize that, on the face of the matter, it would appear that the legislature was remiss in not considering the best interests of the child as the sole determinative basis for an adoption. But it must be remembered that Chapter 63 relates only to adoption, not custody. Permitting the adoption of a child terminates the rights of a natural parent, and should not be ordered without parental consent where that consent is otherwise required except upon a showing that the natural parent has engaged in conduct which justifies the termination of that parent's rights with respect to the child. The legislature has specified in Section 63.072(1) that such conduct must amount to a desertion without affording means of identification or an abandonment. We point out, however, that the denial of a petition for adoption on the ground that abandonment has not been shown does not determine the matter of custody. Custody traditionally has been taken from natural parents and placed in others whenever the parents' neglect or abuse makes that action necessary for the best interests of the child. Section 39.01(9) and Sections 39.40, et seq., Florida Statutes (Supp. 1978). But grounds which may legally justify depriving a natural parent of custody do not necessarily constitute grounds for severing the parental relationship permanently by allowing adoption of the child by others. Wiggins v. Rolls, 100 So.2d 414 (Fla. 1958).
The pivotal question in this case, then, is whether the evidence met the standard of proof required to establish an abandonment of Jennifer by appellant. In this respect, the trial judge concluded that appellant's conduct evidenced an intent or settled purpose to leave Jennifer permanently or at best indefinitely in appellees' care and to forgo all parental responsibilities, and that her actions demonstrated a shirking of the responsibilities cast by law and an abandonment.
We have no quarrel with the trial judge's expression of what constitutes an abandonment for purposes of Section 63.072(1).[3] *344 This court has stated the rule to be that abandonment in the field of jurisprudence dealing with adoption consists of conduct which manifests a settled purpose to permanently forgo all parental rights and the shirking of the responsibilities cast by law and nature so as to relinquish all parental claims to the child. In re Adoption of Prangley, 122 So.2d 423 (Fla. 2d DCA 1960).
We disagree with the trial judge that the evidence in this case established an abandonment under Section 63.072(1). In this respect, it is of the utmost importance to bear in mind the standard of proof which must be met to establish an abandonment. This court has several times pointed out that abandonment must be shown by clear and convincing evidence. In the Interest of C.K.G., 365 So.2d 424 (Fla. 2d DCA 1978); In re Adoption of Wilson, 328 So.2d 50 (Fla. 2d DCA 1976); In re Adoption of Prangley, supra; Roy v. Holmes, 111 So.2d 468 (Fla. 2d DCA 1959). We hold that the evidence in this case does not meet that standard of proof.
As we have noted above, appellant placed Jennifer in the custody of appellees in February of 1976, when Jennifer was 26 months old and appellant was 18 years of age. Appellant was living at that time with a man who was hostile and abusive, and she testified that she felt it was not good for Jennifer to be in the environment created by appellant's relationship with that man. Considering appellant's circumstances at the time, we do not feel it necessary to interpret her action as expressing a choice between Jennifer and the man with whom appellant was then living. Even from a cold record, we have some idea from appellant's testimony of the difficulties she was then experiencing in dealing with life on her own, which were aggravated by the responsibility of caring for Jennifer. We can just as well view appellant's action in giving Jennifer to the care of appellees as a commendable expression of concern for Jennifer's welfare.
Appellees make much of the fact that on February 16, 1976, appellant accompanied appellees to an office of the Department of Health and Rehabilitative Services and made a formal request for assistance in placing the custody of Jennifer with appellees. (This presumably prompted the subsequent Chapter 39 proceeding.) Appellant testified that she did not intend by this action to stamp the arrangement with permanency; she said that she thought all she was doing was giving permission for medical treatment so that, if anything happened to Jennifer, appellees would be able to obtain medical treatment for her. Appellant has never given written consent to appellees' custody of Jennifer and did not receive notice of the Chapter 39 proceeding which produced the orders of February 24, 1976, and March 1, 1977.
In any event, the trial judge did not find that appellant's actions in February 1976, in and of themselves, constituted an abandonment. Indeed, other than stepparent adoption cases, the typical adoption case seems to arise from a situation in which natural parents have given the custody of their child to those who thereafter seek adoption. Leaving a child temporarily in the care of others or giving up the custody of the child pursuant to an agreement or other formal arrangement does not, standing alone, constitute an abandonment. In re Adoption of Gossett, 277 So.2d 832 (Fla. 1st DCA 1973); Annot., 35 A.L.R.2d 662 (1954), sections 14 and 15. We focus, therefore, on appellant's actions and inactions from February 1976, when she placed Jennifer in the care of appellees, to the date of the filing of appellee's petition for adoption on October 27, 1977.
It is undisputed that during this period of time appellant never contributed to Jennifer's support although she was able to do so. She said that this was because "they told me not to." Appellees testified that appellant never offered to furnish support for Jennifer, but it is also true that appellees never asked for money, clothing, or other necessities for Jennifer, and indicated to appellant that Jennifer had plenty of everything, *345 which indeed she had. Appellant said that she would have sent money and clothes if she thought Jennifer needed them.
The failure of a natural parent to support a child, while a relevant circumstance to be considered, is not in and of itself a sufficient basis for permitting the adoption of the child over the objection of the parent. In re Adoption of Wilson, supra; Annot., 35 A.L.R.2d 662 (1954), section 9. As we have said, the scenario in the case before us represents a rather typical adoption situation. The natural parent places the child in the care of others and then fails to provide support for the child while the child remains in the custodial home. We have found no case in which these two factors, standing alone, have been held to constitute an abandonment. In those cases in which abandonment has been found, the evidence has shown that, in addition, the natural parent failed to show any interest in the child, indicating a complete withdrawal from and neglect of parental duty and responsibility. E.g., In re Adoption of Lee, 174 So.2d 87 (Fla. 2d DCA 1965). It is this expression of disinterest by the natural parent which seems to be the pivotal factor in determining whether the natural parent has abandoned the child. Steets v. Gammarino, 59 So.2d 520 (Fla. 1952). Compare Harden v. Thomas, 329 So.2d 389 (Fla. 1st DCA 1976) and Turner v. Adoption of Turner, 352 So.2d 957 (Fla. 1st DCA 1977).
In this case appellant sent Jennifer gifts on only two occasions, but talked to her on the telephone a number of times. In addition, she and appellees corresponded, and appellees sent pictures of Jennifer to appellant.
On the other hand, appellant never saw or visited with Jennifer during this period of time. She was then living in Key West, which we recognize is a considerable distance from appellees' home in Arcadia. Appellant and appellees disagree as to why there was no visit; appellant testified that every time she asked appellees if she could come up, they said "no." Appellees, on the other hand, testified that they never denied appellant access to Jennifer.
Apparently sensing a developing battle with appellees over Jennifer, appellant consulted a lawyer in July of 1977 in an effort, in her words, "to get Jennifer back." About the same time, after first writing to appellees that she wished to visit Jennifer, appellant went to Arcadia, admittedly taking a chance that appellees would be home, and found no one at appellees' residence when she arrived. In September 1977, appellant's attorney wrote a letter to appellees' attorney asking if appellant could visit Jennifer. There is no indication that this letter was ever answered. Shortly thereafter the petition for adoption was filed.
Appellees apparently have felt that the environment of their home was far superior to anything that appellant could offer Jennifer, and that appellant's life was both unstable and unpredictable. Further, appellees admittedly encouraged Jennifer to think of appellees as her parents and to refer to them as such. Significantly, they told Jennifer that appellant was her "Aunt Doris" and asked appellant to call herself Aunt Doris when she talked to Jennifer on the telephone. Appellant said she complied with that request so as not to upset Jennifer. Without implying criticism of appellees, who have to love the child dearly and whose motives no doubt were the best, we nevertheless observe that appellees actively encouraged the development of a parent-child relationship between them and Jennifer to the exclusion of appellant as a factor in Jennifer's life.
We fail to find in this case that absence of interest, that withdrawal from and neglect of parental duty and responsibility, which evinces a settled purpose on appellant's part to forsake permanently all her parental rights and to relinquish all her parental claim to Jennifer. It has been observed many times that the conduct of a natural parent may constitute neglect, indifference, or even irresponsibility for a child's welfare, but nevertheless may not amount to abandonment. E.g., Roy v. Holmes, supra; In re Adoption of Gossett, *346 supra. In contemplation of the law, abandonment is absolute, complete, and intentional, and must be established by clear and convincing evidence. We hold that there was no such evidence of abandonment in this case. In this respect we agree with the analysis of the trial judge in Adoption of Sanderson, County Ct., 143 N.Y.S.2d 520 (Steuben County Ct. 1955), a case involving a very similar situation.
In closing we note that Jennifer remains a dependent child in the Chapter 39 proceedings pending in the trial court. That case is not formally before us but the exhibits in this record show that the trial judge also presided over those proceedings. The last order the trial judge entered in the dependency case was dated November 28, 1977, one month after the petition for adoption was filed in the case at bar. The order placed temporary custody of Jennifer with appellees. The dependency proceedings, of course, remain open for such further orders as the trial court deems in the best interest of Jennifer upon petition of appellees, appellant, or the Department of Health and Rehabilitative Services, which has had legal custody and has supervised Jennifer's placement with appellees in the past. The trial judge exercising the jurisdiction prescribed in Chapter 39 over dependent children could very likely be faced with petitions for child support, visitation rights, change or termination of custody, further supervision by the Department, authorization for medical treatment, and similar requests. In that event the thorough social investigations of the parties and child which were done by the Department in this action can be up-dated without undue delay. When the trial judge decides those questions he will be guided by the best interest of the child test and the standard of proof, unlike that in the case before us, is preponderance of the evidence. In The Interest of C.K.G., supra.
REVERSED.
HOBSON, J., concurs.
GRIMES, C.J., dissents with opinion.
GRIMES, Chief Judge, dissenting.
Judge Danahy's well reasoned analysis of the law will provide considerable guidance to those engaged in adoption proceedings. Nevertheless, I believe the majority has unwittingly fallen into the trap of substituting its judgment for that of the trial judge in the application of the law to the facts of this case.
In referring to appellant's circumstances when she placed Jennifer in the custody of appellees in February, 1976, this court concludes that rather than interpreting her conduct as expressing a choice between Jennifer and the man with whom she was then living it "can just as well view appellant's action in giving Jennifer to the care of appellees as a commendable expression of concern for Jennifer's welfare." While this court can take that view, the point is that the trial judge took the other view. Not only did appellant accompany appellees to the office of Family Services and ask that custody of Jennifer be given to appellees, she then left for parts unknown. Perhaps this is why she never received notice of the Chapter 39 proceeding which resulted in the order granting custody to appellees.
Appellant argues that she only contemplated leaving the child with appellees on a temporary basis. Yet a year after she left the child, she wrote appellees a letter in which she said "I've talked to Russ [Jennifer's father] on the phone so we're going to get the divorce started. Then I can get custody of Jennifer and I can sign her over to you."
In light of appellant's lack of efforts to see the child, her failure to furnish any support, and her total acquiescence in allowing appellees to raise Jennifer as their own child, I cannot say that as a matter of law this record does not support the court's finding of abandonment. I respectfully dissent.
NOTES
[1] As far as we can determine from the record, the delay was caused primarily by the nine months consumed by the Department of Health and Rehabilitative Services in completing the social study of appellant and appellees ordered by the trial judge on his own motion. We recognize that such a study is mandated or authorized by § 63.122(5) (to be filed within 90 days) but that study is pertinent only to the determination whether, assuming all necessary consents have been obtained, the adoption is in the best interests of the person to be adopted. Before that question is reached in a case where the written consent of a parent is otherwise required and has not been given, the trial judge must first decide whether to excuse the consent of that parent and proceed without it. In such a case, we believe the better practice would be to conduct a hearing on the question of consent without waiting for the completion of the social study. Should it be determined that no statutory ground exists for excusing the consent of the parent who has withheld it, the social study would become unnecessary.
[2] No order was entered in the Chapter 39 proceeding purporting to commit Jennifer for subsequent adoption. Such a commitment terminates the rights of natural parents and their consents are not necessary in subsequent proceedings for adoption of the child so committed. § 39.41(4), Fla. Stat. (Supp. 1978); § 63.062(3) and § 63.072(2). Fla. Stat. (1977).
[3] The rights of a natural parent may be terminated not only in a Chapter 63 adoption proceeding but in a proceeding under Chapter 39. If a child is declared dependent in a Chapter 39 proceeding, the trial judge may permanently commit the child to the Department of Health and Rehabilitative Services or a licensed child placing agency willing to receive the child for subsequent adoption. The grounds for such a commitment as stated in § 39.11(1)(b), Fla. Stat. (1977) were changed by the legislature in 1978 and are now stated in § 39.41(1)(d), Fla. Stat. (Supp. 1978). One ground for commitment is a finding that the parent has abandoned the child. In 1978 the legislature also added to Chapter 39 a definition of abandonment for purposes of that chapter which appears more narrow than the definition of abandonment for adoption purposes established by case law in Florida. § 39.01(1), Fla. Stat. (Supp. 1978). Since the 1978 amendment defining abandonment in Chapter 39 took effect October 1, 1978, after the pivotal events in this case, we need not and do not address the question whether the definition of abandonment for purposes of § 63.072(1) and the definition of abandonment for purposes of permanent commitment in a Chapter 39, proceeding are or should be the same.