EMAS, J.
Martine LiFleur (“LiFleur”) appeals from a 2013 order which 1) denied her emergency motion to terminate an agreed temporary order of custody/parental responsibility; and 2) vested temporary custody and parental responsibility in the minor child’s stepmother. For the reasons that follow, we reverse.

FACTUAL BACKGROUND

LiFleur and Nathaniel Webster, Jr. (“Webster”) had a child, N.W., in 1999. LiFleur had custody[1] of N.W. following his birth. Beginning in 2000, LiFleur began experiencing mental difficulties which caused her to be admitted to a mental health center. Thus, Webster filed a motion for custody of N.W. based on LiFl-eur’s mental condition at that time. N.W. went back and forth between LiFleur and Webster for the next few years due to LiFleur’s mental health issues.
In 2003, LiFleur was diagnosed for the first time with bipolar disorder. In 2004, LiFleur sought to regain custody of N.W. She established that she was compliant with a medication regimen and had resolved her mental health issues. Webster and LiFleur entered into a settlement agreement (the “2004 Settlement Agreement”), in which LiFleur was made the primary residential parent of N.W. and agreed to notify Webster if she experienced any recurring mental health issues. The 2004 Settlement Agreement provided that Webster would be entitled to immediate custody of N.W. if LiFleur’s mental health issues presented again. In November of 2004 the court ratified the 2004 Settlement Agreement.
Between 2005 and 2008, LiFleur was twice admitted to mental health facilities. In 2008, LiFleur returned custody of N.W. back to Webster, and N.W. stayed with Webster until after completion of the 2008 school year. Thereafter, N.W. returned to LiFleur.
In September of 2009, however, LiFleur was arrested on a charge of child neglect,[2] after which Webster filed an Emergency Motion for Temporary Sole Custody and *572 Parental Responsibility, seeking temporary custody of N.W. due to LiFleur’s arrest. On February 4, 2010, the court entered an order granting temporary sole custody and primary responsibility to Webster and temporarily requiring supervised visitation with LiFleur (the “2010 Temporary Order”). As part of the 2010 Temporary Order, LiFleur agreed it would be in N.W.’s best interests for LiFleur to undergo a complete psychiatric evaluation prior to having any unsupervised, overnight time sharing, and that Webster shall have “temporary sole custody/time sharing rights and sole parental responsibility over the minor child until such time as [LiFl-eur] undergoes a complete psychiatric evaluation and the Court permits reunification.” Following the 2010 Temporary Order, N.W. was in the continuous custody of Webster (or Webster’s wife and N.W.’s stepmother, Jennifer (“Stepmother”)).
In 2011, LiFleur’s mental health difficulties resurfaced and she concedes that she was not compliant with her medication and treatment at this point in time. Also in 2011, LiFleur was charged in Palm Beach County with conspiracy to commit racketeering, conspiracy to traffic in oxycodone, and trafficking in oxycodone. LiFleur was released, and the charges against LiFleur remained pending at the time of the final order in this case.
During this same period of time, Webster was indicted in Ohio on seven counts of unlawful sexual conduct with a minor.[3] In April 2012, Webster was convicted of four counts of unlawful sexual conduct with a minor, and in June of 2012, Webster was sentenced to twelve years in Ohio state prison. Despite Webster’s incarceration, however, N.W. remained in Ohio, where he was being cared for by Stepmother.
On February 21, 2012, LiFleur moved to dissolve the 2010 Temporary Order on the grounds that the child neglect charges against her were dropped and that Father had been arrested and was being held in custody on the charges of unlawful sexual conduct with a minor. The court denied the motion.
In October of 2012, following Webster’s conviction and twelve-year prison sentence, LiFleur filed a renewed motion to dissolve the 2010 Temporary Order on the grounds that Webster now stood convicted of four counts of unlawful sexual conduct with a minor and was serving a twelve-year prison sentence. Given Webster’s long-term incarceration, LiFleur contended, the 2010 Temporary Order (which granted Webster temporary sole custody and parental responsibility) was rendered unenforceable.
The court denied the motion. The court found that it was in N.W.’s best interest to be with his Stepmother and his paternal grandmother, Linda Webster (“Grandmother”), who had been caring for N.W. since the time of Webster’s arrest and incarceration. The court ordered that all parental responsibility and decision-making would “remain” with Stepmother and Grandmother until further order of the court. The court also determined that LiFleur had not complied with the 2010 Temporary Order’s requirement that she undergo a complete psychiatric examination and provide the results to the court. The court further found that LiFleur’s pre-trial release status on pending felony drug trafficking charges had done nothing to alleviate the court’s concerns about her fitness to parent.
In November of 2012, LiFleur filed a verified motion for a referral to Family Court Services for a psychiatric evaluation. *573 LiFleur alleged she was ready, willing and able to submit to a complete psychiatric evaluation, consistent with the court’s previous order. The court entered an order referring LiFleur to Family Court Services, but only for the purpose of a psychological evaluation. As directed by the court, LiFleur completed the psychological evaluation with Beraja Counseling Center, and the report concluded that LiFleur was emotionally stable and compliant with her psychiatric and psychological treatment. At a status conference on July 10, 2013, the trial court acknowledged it had reviewed the evaluation report and that it was “a favorable report of the Mother.”
On July 28, 2018, following the psychological evaluation, LiFleur filed her Emergency Motion to Terminate Temporary Custody/Time-Sharing and Parental Responsibility vested in the Paternal Family and for a Child Pick-Up Order (the “Emergency Motion”). This Emergency Motion is the subject of the instant appeal and was grounded on LiFleur’s contention that the 2010 Temporary Order could not continue to remain in force, that custody/parental responsibility was improperly delegated to Stepmother and Grandmother, and that LiFleur is a fit parent with the constitutional, fundamental right to resume parental responsibility of the minor child.
The court conducted an evidentiary hearing on the Emergency Motion on August 19 and 23, 2013. At the hearing, LiFleur testified that since her arrest in 2009 she has accepted the fact that she suffers from bipolar disorder; that she began regular treatment with Dr. Poitier, a psychiatrist she has been seeing for more than a year; and that she has resumed a regular course of therapy and a medication regimen with which she has been compliant for more than a year. LiFleur also testified that she is employed as a Physician’s Assistant and lives in a four-bedroom, three-bath home in Plantation. LiFleur stated she was prepared for N.W. to return home to Florida and to resume her responsibilities as N.W.’s primary residential parent.
Dr. Artiles, a licensed psychologist, and Dr. Croskey, a private therapist, also testified on behalf of LiFleur. Both opined that LiFleur was a fit parent capable of caring for N.W. After LiFleur rested her case, Stepmother and Grandmother testified on Webster’s behalf. Stepmother admitted she was not a party to the action and had never sought to intervene or take other formal steps to seek custody of N.W. Stepmother testified about LiFleur’s mental history and noted that N.W. was doing well in Ohio. Grandmother testified that N.W. was happy and thriving in Ohio but that she would like to see N.W. reunified with LiFleur. Grandmother has not sought to intervene in the action and testified at the evidentiary hearing that she does not want custody of N.W.
On September 25, 2013, the court entered an order denying LiFleur’s Emergency Motion and directed that N.W. “remain” with his Stepmother.[4] The court found in pertinent part:
Given that it appears that the child is doing well with his stepmother and step-siblings at present in Ohio, given that the court has not yet heard from the Guardian ad Litem, given that the court does not have a recent psychiatric report, and given that the court wishes to hear from the child directly, in camera, about what his wishes are regarding *574 timesharing, the request for emergency relief is hereby DENIED.
The trial court ruled that “the child will, until further order of this court, remain with his stepmother, with the mother permitted supervised time-sharing as previously ordered.” (Emphasis supplied).
This appeal followed.

ANALYSIS

We review the trial court’s factual findings for an abuse of discretion, and we review the trial court’s application of law de novo.
A parent’s “right to make decisions regarding the care, custody, and management of his [or her] children’s lives is a fundamental liberty interest of constitutional dimensions.” In re N.Z.B., 779 So.2d 508, 511 (Fla. 2d DCA 2000). See also Von Eiff v. Azicri, 720 So.2d 510 (Fla.1998). When a dispute is between two natural parents, both of whom are fit and share equal rights to custody, the test to be applied in a custody dispute involves the determination of the child’s best interests. In re Guardianship of D.A. McW., 460 So.2d 368 (Fla.1984).
On the other hand, where a custody dispute is between a natural parent and a non-parent, a “natural parent of a child born out of wedlock should be denied custody only where it is demonstrated that the parent is disabled from exercising custody or that such custody will, in fact, be detrimental to the welfare of the child.” Id. at 870. See also, Webb v. Webb, 546 So.2d 1062 (Fla. 3d DCA 1989) (finding the trial court abused its discretion in awarding custody to stepmother, in the absence of clear and convincing evidence that the child’s natural mother was unfit or had abandoned her son). “To hold otherwise would permit improper governmental interference with the rights of natural parents who are found fit to have custody of and raise their children.” D.A. McW., 460 So.2d at 370. There is a strong public policy in favor of the natural family unit. Id. Thus, a trial court cannot engage in a “best interests of the child” analysis unless and until there is sufficient proof to establish parental unfitness or substantial threat of significant and demonstrable harm to the child. Richardson v. Richardson, 766 So.2d 1036 (Fla.2000); Von Eiff, 720 So.2d at 514.
Here, by virtue of the 2004 Settlement Agreement, LiFleur was designated as N.W.’s primary residential parent, with instructions that Webster be granted immediate custody over N.W. if LiFleur’s mental health deteriorated. After LiFleur was arrested on child neglect charges and her mental health was shown to have deteriorated, Webster — and Webster alone— was granted temporary sole custody and primary responsibility over N.W. pursuant to the 2010 Temporary Order. As described previously, LiFleur and Webster agreed, as part of the 2010 Temporary Order, that it would be in N.W.’s best interests for LiFleur to undergo a complete psychiatric evaluation prior to having unsupervised, overnight time sharing with N.W., and that Webster would have temporary sole custody and parental responsibility over N.W. until such time as LiFleur successfully completed a psychiatric evaluation and sought reunification.
The 2010 Temporary Order adjudicated the issue of temporary custody as between LiFleur and Webster. Significantly for our purposes, the 2010 Temporary Order was the result of an agreed modification of the 2004 Settlement Agreement between LiFleur and Webster, and neither Stepmother nor Grandmother was a party to the paternity action, the 2004 Settlement Agreement, or the 2010 Temporary Order.
*575 Had the Emergency Motion to terminate the 2010 Temporary Order (and the court’s subsequent order entered thereon) involved a determination of custody as between N.W.’s two parents, application of the best-interests-of-the-child test would have been appropriate. D.A. McW., 460 So.2d at 369. However, such was not the case. Instead, the Emergency Motion sought to terminate the 2010 Temporary Order and return N.W. to LiFleur based on the fact that Webster was legally and practically incapable of fulfilling his role under the 2010 Temporary Order. Webster’s long-term incarceration rendered the 2010 Temporary Order unenforceable, leaving LiFleur as the only parent who could be the primary residential parent of, and have parental responsibility for, N.W. We agree with LiFleur that the court erred in not granting the motion to terminate the 2010 Temporary Order.
Given the existence of the 2004 Settlement Agreement, the now-unenforceable 2010 Temporary Order, and LiFleur’s constitutional and fundamental right as N.W.’s natural parent, the trial court was required to return custody to the natural parent in the absence of proof, by clear and convincing evidence, that the natural parent is unfit or has abandoned the child. Webb, 546 So.2d at 1065. No such proof was presented at the hearing.
Additionally, the trial court appeared to rely on the “best interests of the child” standard, required LiFleur to establish compliance with a 2010 order that was no longer enforceable, and misallocated the burden of proof. The court required LiFl-eur to prove fitness, rather than requiring Webster to prove by clear and convincing evidence that LiFleur was unfit to parent N.W. or had abandoned him.[5] As a result, rather than returning to the provisions of the 2004 Settlement Agreement, the court found that LiFleur had not provided the court with a complete psychiatric evaluation,[6] that N.W. appeared to be doing well with Stepmother in Ohio, and that the court wanted to hear from the child directly as to his wishes. The court’s articulation of, and reliance upon, these factors was erroneous.
Finally, the court erred in ordering that temporary custody of N.W. “remain” with Stepmother, who is not a natural parent of N.W., was not a party to the action, and had not sought to intervene.[7] There is no provision in the 2004 Settlement Agreement or the 2010 Temporary Order which awarded temporary custody or parental responsibility of N.W. to Stepmother, nor could such an order properly be entered on the record presented. While we are not unmindful of the difficult and challenging circumstances facing the trial court, we are compelled to hold, under the facts of this case, that the court erred in denying the motion to terminate the 2010 Temporary Order and in ordering that Stepmother have temporary custody and parental responsibility of N.W.
Based on the foregoing, we reverse the trial court’s order denying LiFleur’s Emergency Motion, with instructions that the trial court vacate the 2010 Temporary *576 Order, and for further proceedings not inconsistent with this opinion.
Reversed and remanded with directions.

. In October 2008, the Florida Legislature amended Chapter 61, Florida Statutes, and changed the term "custody” to "parental responsibility” and "visitation” to "timeshar-ing.” See Ch. 2008-61, Laws of Fla. The term "custody” was retained in Chapter 61 when used in the context of awarding custody to a non-parent. See § 751.01 et seq., Fla. Stat. (2013). Because the relevant facts of this case took place both before and after the amendments to Chapter 61, this opinion sets forth the history of this case using the terms as they were used by the parties and the court during the course of the proceedings below.

. The child neglect charge against LiFleur was nolle prossed after LiFleur completed a pretrial program.

. None of these allegations or charges involve N.W.

. Unlike the prior order, the order on appeal did not include Grandmother as a joint custodian, an apparent result of Grandmother’s testimony that she did not wish to have temporary or permanent custody of N.W.

. We note also that neither party, nor the Stepmother or Grandmother, had initiated any action pursuant to section 39.301, et seq., Florida Statutes (2013).

. As discussed earlier, LiFleur requested a psychiatric evaluation prior to the evidentiary hearing. The only reason why LiFleur had not completed a psychiatric evaluation at the time of the evidentiary hearing is that, despite LiFleur’s request, the trial court referred LiFl-eur for a psychological evaluation instead.

.Nor had Stepmother or Grandmother filed a petition for temporary custody pursuant to Chapter 751 ("Temporary Custody of Minor Children by Extended Family”).